NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0747n.06
Filed: December 8, 2008

No. 06-3869

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT


BRADLEY W. CROSBY, ROSE M. CROSBY, )
MONTY A. CUMMINGS, CATHY J. CUMMINGS, )
JEREMIAH S. RAYBURN, )
    Plaintiffs-Appellants, )
     )
v. )
     )
PICKAWAY COUNTY GENERAL HEALTH )
DISTRICT, PICKAWAY COUNTY, GLENN ) ON APPEAL FROM THE
REESER, JOHN STEVENSON, ULA JEAN ) UNITED STATES DISTRICT
METZLER,    COURT FOR THE SOUTHERN
   DISTRICT OF OHIO
    Defendants-Appellees.


BEFORE: BOGGS, Chief Judge; GIBBONS, Circuit Judge; and BELL, District Judge.[*]

    BOGGS, Chief Judge. Landowners Bradley Crosby, Rose Crosby, Monty Cummings, Cathy Cummings, and Jeremiah Rayburn (collectively "Appellants") sued Pickaway County General Health District ("Health District") and Pickaway County and its Commissioners, arguing that the Health District's decision to revoke a permit to install a sewage system on their land was a regulatory taking subject to the Just Compensation Clause of the United States Constitution. The Appellants also alleged that the County and Commissioners were responsible for the Health District's decision

---

    [*] The Honorable Robert Holmes Bell, Chief Judge of the United States District Court for the Western District of Michigan, sitting by designation.

to revoke the permits. The district court granted summary judgment to the County and Commissioners, concluding that they were not the parties responsible for the action claimed to violate Appellants' constitutional rights. The district court granted summary judgment to the Health District on the grounds that Appellants' takings claim was unripe. The landowners now appeal, and we affirm in part, vacate in part, and remand to district court.

I

In the spring of 2003, Bradley and Rose Crosby jointly purchased a plot of real property along Hoover Road within Harrison Township in Pickaway County that was designated as Lot 5 in the Hoover Farm Subdivision ("Lot 5"). Around the same time, Monty Cummings, Cathy Cummings, and Jeremiah Rayburn jointly purchased the adjoining lot, Lot 4. The Appellants intended to build single-family houses, which they would then sell.

On March 25, 2003, prior to the purchases, Four Star Development Company ("Four Star"), the then-owner of the lots, filed a "Sewage System Applicant/Permit" application with the Health District, requesting to install a sewage system on Lots 4 and 5. After receiving Four Star's application, the Health District evaluated the site and listed its requirements for the proposed sewage systems, including the size of the septic tank and leach bed for each lot. Appellants allege that, in reliance on the Health District's evaluation, each group of owners built a single-family house on their respective lots.

On March 19, 2004, after Appellants had completed construction but before the septic tanks and leach beds had been installed, the Health District sent Appellants a letter suspending its prior approval of the sewage system permits, explaining that the County had been experiencing problems

with surface water affecting sewage systems and stating that before permits would be issued, Appellants needed to present a drainage plan for Lots 4 and 5. Shortly thereafter, Appellants submitted a drainage plan, which the Health District reviewed and rejected as inadequate. The Health District explained that the "plans submitted [would] still affect the neighbors" and would "likely create a larger problem for your lots and other lots." The Health District stated that "further corrective measures or [new] plans will be needed before a septic system can be installed."

On September 28, 2004, instead of submitting a second drainage plan, Monty Cummings attended a regular public meeting of the Board of Health, the entity that governs the Health District, and requested permission to install a septic system on Lot 4. The Board of Health adopted a resolution denying his request.

To date, the Appellants have not submitted a second drainage plan. Accordingly, the Health District has not approved the permits for installation of the septic tanks and leach beds, and the two single-family houses on Lots 4 and 5 remain vacant.

On October 8, 2004, Appellants filed a complaint in the United States District Court for the Southern District of Ohio against the Health District, Pickaway County, and three county commissioners in their official capacity,[1] Glenn Reeser,[2] John Stevenson, and Ula Jean Metzler (collectively "Commissioners"). The federal complaint alleged two claims under 42 U.S.C. § 1983. First, the Appellants alleged that the defendants violated their substantive and procedural due process

---

[1]Appellants' brief explains that the Commissioners were named parties to make sure that the County was "properly sued."

[2]The complaint originally listed Robert Haffe, who since has been replaced by Glenn Reeser.

rights by "suspending or revoking their permit after defendants had issued said permit and [Appellants] had relied on said permit in constructing a house for resale." Second, the Appellants alleged that the defendants deprived the Appellants of their property without just compensation by revoking the permits and thereby "depriving [Appellants] of the opportunity to resell said houses."

On July 20, 2005, Appellants also filed a complaint against the same defendants[3] in the Pickaway County Court of Common Pleas, asking the court to issue a writ of mandamus ordering the Health District to "institute condemnation proceedings in accordance with Chapter 163 of the Ohio Revised Code." The facts as described in the state court complaint were substantially identical to those described in the federal complaint with the exception that the state court complaint, unlike the federal complaint, alleged that "Plaintiffs have requested Defendants to compensate them for this taking and Defendant[s have] refused to do so."[4]

Meanwhile, in the federal proceedings, Pickaway County and the Commissioners filed a motion for summary judgment on November 14, 2005. On November 29, 2005, the Health District also filed a motion for summary judgment. Appellants filed a single memorandum in opposition to both summary judgment motions. The district court accordingly addressed both motions in a single opinion and order issued on May 12, 2006. The district court held that the County was not responsible for suspending approval of Appellants' sewage applications, nor could it be held vicariously liable. It thus granted the County and Commissioners' motion for summary judgment.

---

[3]This complaint listed Glenn Reeser and not Huffer.

[4]There is no evidence in the record before this court that the Appellants ever made such a request.

The district court then granted summary judgment to the Health District, holding that Appellants' claims were unripe because they had not yet been denied just compensation. The district court also dismissed the Appellants' due process claims, holding that they were ancillary to the takings claims, and therefore similarly unripe. The judgment was entered on May 16, 2006.

On May 22, 2006, less than ten days after the judgment was entered, Appellants moved for relief from the federal court judgment pursuant to Rule 60(b) of the Federal Rules of Civil Procedure. On June 8, 2006, before the court had addressed the motion, Appellants filed a notice of appeal of the district court's May 12, 2006, opinion and order.

Thereafter in state court, on June 27, 2006, the Pickaway County Court of Common Pleas entered a decision granting summary judgment to the County and Commissioners, explicitly agreeing with the district court's opinion that "[t]he entity responsible for suspending approval of [Appellants'] applications . . . was neither Defendant Pickaway County nor Defendant Commissioners." *Crosby v. Pickaway County Gen. Health Dist.*, No. 2005-CI-352, slip op. at 3 (Pickaway County Ct. Com. Pl. June 27, 2006) (internal quotation marks omitted) (omission in original). Three months later, on October 5, 2006, in a separate decision and order, the Court of Common Pleas granted the Health District's motion for summary judgment. *Crosby v. Pickaway County Gen. Health Dist.*, No. 2005-CI-352 (Pickaway County Ct. Com. Pl. Oct. 5, 2006). The state court acknowledged that Cummings had received a final order from the Health District when, at the September 28, 2004, public meeting, the Board adopted a resolution denying his request for a sewage permit. *Id.*, slip op. at 3-4. However, it concluded that "Plaintiff Crosby failed to request a hearing on the conditional suspension of the sewage system permit and, thus, never received a final

order of the Board." *Id.*, slip op. at 5. The state court then dismissed the takings claims of all Appellants on the grounds that Cummings did not pursue the proper administrative remedy– appealing the Health District decision–and that the other parties had never even received an appealable final decision. On November 3, 2006, Appellants filed a notice of appeal of the state court decision.

Back in federal court, on October 18, 2006, while the district court was still considering Appellants' Rule 60(b) motion, Appellants filed a supplemental motion notifying the district court that the state court had issued a decision. On December 12, 2006, the district court denied Appellants' motion to set aside the judgment. Its opinion and order made no reference to the state court decision. Under Fed. R. App. P. 4(a)(4)(B)(ii), a "party intending to challenge an order disposing of" a motion for relief from judgment "must file a notice of appeal, or an amended notice of appeal – in compliance with Rule 3(c)." The record shows no evidence that Appellants ever filed such a notice.

Seven months later, in July 2007, the Appellants filed their brief in support of their appeal of the federal district court decision.[5] On December 14, 2007, the Ohio Court of Appeals issued a decision in the Appellants' state court action, affirming the lower court's dismissal of Appellants' complaint for a writ of mandamus on the grounds that the Appellants' action was unripe because they had failed to exhaust their administrative remedies. *Crosby v. Pickaway County Gen. Health*

---

[5] Appellants addressed the issue of the district court's denial of its Rule 60(b) as if they had properly appealed it. Oddly, the County and Commissioners did not point out the procedural deficiency but responded by addressing the merits of Appellants' arguments.

No. 06-3869
Crosby v. Pickaway County Gen. Health Dist.

*Dist.*, No. 06CA27, 2007 WL 4395154 (Ohio Ct. App. Dec. 14, 2007). On January 3, 2008, Appellants moved this court to take judicial notice of the Ohio Court of Appeals decision.

We affirm the district court's grant of summary judgment to Pickaway County and its Commissioners. We vacate the grant of summary judgment to the Health District and remand to the district court on the grounds that the Appellants' takings claim has since ripened because the state court has denied them compensation, and that claim can now be resolved by the district court. We affirm the grant of summary judgment to the Health District on the substantive due process claim.

II

We review a grant of summary judgment de novo, *Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999), under the familiar standard of Fed. R. Civ. P. 56(c) and *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

## A. Pickaway County and Commissioners

The Appellants assert that the County "played a substantial role in the revocation of [Appellants'] permits." (Appellants' Br. 35). They assert two arguments for the County's liability. First, they argue that the County Prosecuting Attorney, the County, and the County Engineer's office were part of a committee that was formed to investigate the problems of ponding surface water; and it was the committee that decided to suspend the sewage permit. (Appellants' Br. 33). Second, they argue that the permits "were suspended . . . on the advice of the Pickaway County Prosecutor," *ibid.*, and that when Appellants appealed directly to the Board of Health at the public meeting, the

Board denied their request on the advice of the County Prosecutor. The Appellants give no argument as to why the Commissioners are liable.

The Appellants brought their takings and due process claims pursuant to 42 U.S.C. § 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

The Supreme Court held in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), that municipalities cannot, in general, be held vicariously liable under § 1983:

> [T]he language of § 1983, read against the background of [its] legislative history, compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort. In particular . . . a municipality cannot be held liable *solely* because it employs a tortfeasor–or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.

*Id.* at 691.

For a "policy" to give rise to liability under § 1983, "it is not enough . . . merely to identify conduct properly attributable to the municipality." *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 404 (1997).

> The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

*Ibid.*

While in general a plaintiff must prove a "direct causal link" between municipal action and deprivation, the Supreme Court has identified a narrow exception as to when a municipality may be held vicariously liable for an official's action. In *Pembaur v. City of Cincinnati*, the Court held that "municipal liability under § 1983 attaches where–and only where–a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." 475 U.S. 469, 483 (1986).

To proceed on their claim, the Appellants must identify either: (1) a direct causal link that would confer direct liability on the County and Commissioners; or (2) action on the part of municipal employees that amount to a "final policy" that promoted or condoned constitutional wrongs.

*1. Direct liability*

The Health District is a creature of Ohio law. Ohio Rev. Code § 3709.01. Each health district is governed by a board of health consisting of five members, four of whom are appointed by a body known as the district advisory council. Ohio Rev. Code §§ 3709.02(A), 3709.03(A). By law, the district advisory council has sixteen members, only one of whom is a commissioner, and only this commissioner is a county employee. The council has only one regular meeting a year, at which it makes the necessary appointments to the board of health, receives and considers the annual or special reports from the board of health, and makes recommendations to the board of health or to the department of health in regard to matters for the betterment of health and sanitation within the district or for needed legislation. Ohio Rev. Code § 3709.03(A). The County and Commissioners thus have only the slightest of connection to the Health District. The district court was therefore

correct to conclude that the County and Commissioners could not be liable because there was "no causal link between those defendants and the suspension of approval of Appellants' applications."

*2. Indirect liability*

The Appellants also allege that the County can be held liable under *Pembaur* because the Health District relied on the advice given by two Pickaway County employees: the County Engineer and the County Prosecutor.

The question is whether either the Engineer's or the Prosecutor's advice amounted to an assertion of "final policy." *Pembaur*, 475 U.S. at 482-83. "[W]hether a particular official has final policymaking authority is a question of *state law*." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (internal quotation marks omitted).

a. The County Engineer

The Appellants provide absolutely no argument that the advice given by the Engineer amounted to official policy. Ohio law does not confer any such authority. Ohio Rev. Code § 315.08 (describing the duties of the County Engineer). Appellants' only attempt at an argument is their claim that the County Engineer was part of the committee formed in spring 2004 to investigate the problems of ponding surface water. (Appellants' Br. 33). This is clearly not enough to confer liability on the County.

b.  The County Prosecutor

The Appellants' argument concerning the County Prosecutor, though slightly better articulated, also fails. The Appellants rely heavily on *Pembaur*.   In *Pembaur*, a sheriff attempted to execute an arrest warrant for several of Pembaur's employees at Pembaur's place of business. Pembaur refused to allow the police to enter. The sheriff contacted the county prosecutor, who in turn "instructed" the sheriff to "go in and get" the employees. *Pembaur*, 475 U.S. at 472-73. The police then used an axe to chop down the door in order to execute the arrest warrants. Pembaur sued under § 1983, arguing that the police violated his Fourth Amendment rights. The Court held that Pembaur's rights had been violated because the Fourth Amendment prohibits police, absent exigent circumstances, from searching an individual's home or business without a search warrant even to execute an arrest warrant for a third person.  Having acknowledged a violation of rights, the only question was whether the municipality could be held liable under § 1983. The Court ultimately held that it could, basing its decision on the fact that the county prosecutor authorized the sheriff to take the illegal actions. Because the county prosecutor "was acting as the final decisionmaker for the county," the sheriff's action represented the municipality's official policy.  *Id.* at 485.

The facts of *Pembaur* are far different from those in the case at hand. The record shows that Prosecutor Gene Long was only an *advisor* to the Health District. The Appellants argue that Long was acting in more than an advisory role and point to certain portions of Dallas Hettinger's and Denise Minor's deposition testimony as evidence. The relevant portion of Minor's testimony is as follows:

> Q. I'm going to hand you [the notes from the September 28, 2004 regular public meeting of the Board of Health] and you can take a look at it. It's a two-page document.
>
> . . .
>
> Q. In here, it mentions the Pickaway County Prosecutor Gene Long and his advice and I believe earlier you said you met with– or you spoke with the prosecutor; is that correct?
>
> A. Yes.
>
> Q. And that was Mr. Long?
>
> A. Yes.
>
> Q. And did he give you certain advice?
>
> A. Yes.
>
> . . .
>
> Q. Did you rely on his advice–
>
> A. Yes.
>
> Q. –in taking–could you tell me what his advice was to you?
>
> Ms. Courtwright: Objection.
>
> Mr. Holloway: Objection, privileged. Don't answer the question.
>
> Q. We have sort of touched this but I wanted to give you an opportunity to say–why exactly, in your mind, was–were the permits suspended?
>
> A. Public health issues.

The relevant portion of Hettinger's testimony is:

> Q. When you say, "Per prosecutor Gene Long," what role did the prosecutor, Gene Long, have in this?

A. Denise Minor, the [H]ealth Commissioner, and I discussed this with Gene Long to discuss what proceedings we would need to take in order to do this suspended permit.
. . .

Q. I'm not going to ask you what went on in the meetings. I'm asking you for what you did in this case. Did you rely on the advice Mr. Long gave you in taking the actions to suspend the permits?

A. I discussed it with the Health Commissioner. We evaluated what the situation was with the rules and then we took that information to the prosecutor for advice on how to proceed.

Q. But I guess my question is, whatever advice he gave you–I don't want to know what it is, but whatever advice he gave you did you rely on that in suspending the permits?

Mr. Holloway: Objection. Go ahead and answer the question.

A. Yes.

The Appellants' argument that Long, like the prosecutor in *Pembaur*, "was acting as the final decisionmaker for the county" is unconvincing. Though the record does not detail the exact nature of Long's advice, there is nothing in the record to suggest that his advice related to the Board's (and through it, the Health District's) evaluation of Lots 4 and 5 or to its decision that the installation of septic tanks and leach beds posed "public health issues." What the record does demonstrates is that: (1) it was the "public health issues" that motivated the Board to revoke the permits; (2) these same issues led the Board to deny Cummings's request for an issuance of a permit at its public meeting; and (3) Long's advice in these matters was sought only after the Board had formed its opinion regarding the health concerns. The record also suggests that the Board sought Long's advice regarding how to *execute* its decision to revoke the permit. Long's role in this matter is clearly

- 13 -

different from that of the prosecutor in *Pembaur*. There, the prosecutor instructed the police to take action; here the Board decided to take action and asked the prosecutor for advice on how it could best execute its decision.

Our circuit has not directly addressed the distinction between an attorney's role in creating policy and in giving legal advice, but the Fifth Circuit has examined the issue, concluding that these roles are distinct and that only the former role may give rise to municipal liability. In *Bennett v. Slidell*, 728 F.2d 762, 769 (5th Cir. 1984) (en banc), the Fifth Circuit rejected a claim against a city based upon the actions of the city attorney, even though it affirmed the personal liability of the attorney. *Id.* at 765. In that case, the city attorney deliberately delayed his review of the plaintiff's liquor license application for a nightclub and then advised the city council to delay the application as well. Allegedly, the attorney was influenced by the city auditor, who had a personal stake in the matter. Despite the fact that the attorney was personally liable, the Fifth Circuit held that the attorney did not have "policymaking authority" because he was "employed only to give legal advice." *Id.* at 769. The court emphasized that under Louisiana law, only the city council has the authority to issue liquor licenses. *Ibid*.

Similarly, Ohio law clearly distinguishes between the role of the County Prosecutor and that of the Health District. Under Ohio law, "the prosecuting attorney of the county constituting all or a major part of such district shall act as the legal advisor of the board of health." Ohio Rev. Code § 3709.33. It is the Health District (acting through the Board of Health), however, that makes the ultimate decision to grant or deny sewage permits. Ohio Rev. Code § 3718.02 (A)(3)(d)(5). Regardless of whether the Board listened to the advice of county officials such as the County

Prosecutor or County Engineer, the record displays no evidence that the Health District abdicated its ultimate decisionmaking authority or handed over such authority to the County, its Commissioners, or any other county employee. As such, neither the County, its Commissioners, nor any other county employee can be the source of any official policy that resulted in the suspension or denial of Appellants' sewage permits. The district court was therefore correct to grant summary judgment to these defendants, and we accordingly affirm the district court's decision and order on this point.

**B. Pickaway County Health District**

The district court granted summary judgment to the Health District on the grounds that Appellants' claims were unripe. Federal courts have jurisdiction only over those suits that present an actual "case" or "controversy." U.S. Const. art. III, § 2; *see also Raines v. Byrd*, 521 U.S. 811, 818 (1997). "No principle is more fundamental to the judiciary's proper role in our system of government than [this] constitutional limitation of federal-court jurisdiction." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976) (citing *Flast v. Cohen*, 392 U.S. 83, 95 (1968)). Ripeness is not just a procedural question, but one that is determinative of jurisdiction. *Arnett v. Myers*, 281 F.3d 552, 562 (6th Cir. 2002). As the Court has made clear in several decisions:

> [A] claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue.

*Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186 (1985) (collecting cases).

Furthermore, a state's action in a takings claim "is not 'complete' in the sense of causing a constitutional injury" until the property owner has used the proper state procedures and the state has failed to provide just compensation for the taking. *Id.* at 195. The only situation in which Appellants are exempted from this requirement of seeking state remedies is if they can demonstrate that available state procedures are inadequate. *Ibid.*

Appellants argue that *Williamson County* is no longer good law. As evidence of this, they cite the concurring opinion of Chief Justice Rehnquist in *San Remo Hotel, L.P. v. City and County of San Francisco*:

> Finally, *Williamson County*'s state-litigation rule has created some real anomalies, justifying our revisiting the issue. For example, our holding today ensures that litigants who go to state court to seek compensation will likely be unable later to assert their federal takings claims in federal court. And, even if preclusion law would not block a litigant's claim, the *Rooker-Feldman* doctrine might, insofar as *Williamson County* can be read to characterize the state courts' denial of compensation as a required element of the Fifth Amendment takings claim. As the [majority opinion] recognizes, *Williamson County* all but guarantees that claimants will be unable to utilize the federal courts to enforce the Fifth Amendment's just compensation guarantee.

545 U.S. 323, 351 (2005) (Rehnquist, J., concurring) (internal citations omitted). Appellants also point to two cases outside this circuit: *Kottschade v. City of Rochester*, 319 F.3d 1038 (8th Cir. 2003), and *Wilkinson v. Pitkin County Bd. of County Comm'rs*, 142 F.3d 1319 (10th Cir. 1998). In *Kottschade*, the court acknowledged that "[t]he requirement that all state remedies be exhausted, and the barriers to federal jurisdiction presented by res judicata and collateral estoppel that may follow from this requirement, may be anomalous." 319 F.3d at 1040-41. But it concluded that "[n]onetheless, *Williamson* controls the instant case." *Id.* at 1041. Likewise, the *Wilkinson* court

noted its "concern that *Williamson*'s ripeness requirement may, in actuality, almost always result in preclusion of federal claims, regardless of whether reservation is permitted." 142 F.3d at 1325 n.4. It nevertheless concluded that *Williamson County* was still good law. *Ibid.*

These three cases do nothing to undercut the validity of *Williamson County*. The Supreme Court's majority decision in *San Remo* is predicated on *Williamson County*. Moreover, the Court has not yet accepted Chief Justice Rehnquist's invitation to reexamine *Williamson County*'s exhaustion requirement. Until it does so, *Williamson County* remains good law.

Thus, to proceed on their takings claim, Appellants must demonstrate that: (1) the Health District reached a final decision; and (2) either they used the proper state proceedings and the state denied them just compensation or they were exempt from using those state proceedings because they were inadequate. While the decision of the Health District was arguably final at the time the district court issued its opinion, the Appellants had not availed themselves of the state procedures, nor did they demonstrate the required inadequacy. Therefore, the district court was correct to conclude, at that time, that the Appellants' claims were unripe.

Nevertheless, on October 5, 2006, after the district court issued its decision, the Ohio Court of Common Pleas granted the Health District's motion for summary judgment and denied the Appellants' petition for a writ of mandamus. *Crosby*, No. 2005-CI-352. That decision was subsequently affirmed on December 14, 2007, by the Ohio Court of Appeals. *Crosby,* 2007 WL 4395154.

Because "ripeness is peculiarly a question of timing, it is the situation now rather than the situation at the time of the District Court's decision that must govern." *Reg'l Rail Reorganization*

*Act Cases*, 419 U.S. 102, 140 (1974); *see also Buckley v. Valeo*, 424 U.S. 1, 114-18 (1976); *Stewart*

*v. Hannon*, 675 F.2d 846, 850 (7th Cir. 1982).

*1. Final Decision*

Though the determination of finality is *informed by state law*, it is ultimately a mixed

question of fact and law that must be decided *under the standards of federal law*.

> *Williamson County* prong-one ripeness is a factual determination,[6] taking into
> account all relevant statutes, ordinances, and regulations, that the decisionmaker has
> arrived at a final determination with respect to the permit applicant's use of her
> property, and that that determination is one which will allow a court to determine
> whether a regulatory taking has taken place.

*DLX, Inc. v. Kentucky*, 381 F.3d 511, 525 (6th Cir. 2004).

As the Supreme Court has explained:

> *Williamson County*'s final decision requirement "responds to the high degree of
> discretion characteristically possessed by land-use boards in softening the strictures
> of the general regulations they administer." *Suitum v. Tahoe Regional Planning
> Agency*, 520 U.S. 725, 738 (1997). While a landowner must give a land-use authority
> an opportunity to exercise its discretion, once it becomes clear that the agency lacks
> the discretion to permit any development, or the permissible uses of the property are
> known to a reasonable degree of certainty, a takings claim is likely to have ripened.

---

[6] Though the court uses the term "factual," we should not interpret this to mean that finality
is a pure question of fact. Of course, questions of fact may arise; for example, there might be a
dispute over whether a party actually sought a variance. In those cases, a court may very well be
unable to decide the issue without first submitting the question to a finder of fact. Nevertheless, the
ultimate determination of finality is itself is a question of law determined by the court. In the case
at hand, there is no dispute over the circumstances surrounding Appellants' attempts to receive a
permit, and therefore we review the district court's determination of finality based on the undisputed
facts de novo.

No. 06-3869
Crosby v. Pickaway County Gen. Health Dist.

*Palazzolo v. Rhode Island*, 533 U.S. 606, 620 (2001); *see also DLX, Inc.*, 381 F.3d at 525-26 (describing the inquiry into state law).

Appellants must give the administrative authority the "opportunity to exercise its discretion"; however, once "the permissible uses of the property are known to a reasonable degree of certainty," the decision should be considered final. *Palazzolo*, 533 U.S. at 620. In *Palazzolo*, the Supreme Court distinguished ripe takings cases from those that "challenged a land-use authority's denial of a substantial project, leaving doubt whether a more modest submission or an application for a variance would be accepted." *Ibid.* Our circuit has interpreted this to mean that "a zoning determination cannot be deemed final until the plaintiffs have applied for, and been denied, a variance." *Seguin v. City of Sterling Heights*, 968 F.2d 584, 587 (6th Cir. 1992) (citing *Williamson County*, 473 U.S. at 187-88). Nevertheless, the Supreme Court also cautioned that "[g]overnment authorities, of course, may not burden property by imposition of repetitive or unfair land-use procedures in order to avoid a final decision." *Palazzolo*, 533 U.S. at 621 (citing *Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 698 (1999)).[7]

---

[7] We emphasize the particular roles of federal and state courts in determining finality because the state court also made a determination of the "finality" of the Health District's decision under an Ohio state law that requires would-be Appellants to receive a "final" order or decision before pursuing a writ of mandamus. The state court concluded that Monty Cummings (and presumably his co-owners, Cathy Cummings and Jeremiah Rayburn) had received a final order but that the Crosbys had not, basing its determination on the fact that: (1) Cummings had, at the September 28, 2004, meeting of the Board of Health, received an official resolution denying his request for a sewage permit; and (2) the Crosbys had not sought any review of the Health District's decision. Although the district court and state court came to different conclusions about "finality," the district court was not obliged to adopt the state court's definition of finality nor was the state court obliged to defer to the district court's earlier determination of the matter. The reason is that the two standards of "finality" are actually distinct legal inquiries. Thus, there is no need to delve into the complicated subjects of issue preclusion, comity, or deference.

The district court did not explicitly analyze Ohio law in making its factual determination regarding finality. For example, the court did not note that the Health District provided both a process of review and an opportunity to request a variance; nor did it note that Appellants failed to avail themselves of those remedies. Appellants' April 2004 drainage plan, submitted after the suspension of their health permit, was also rejected by the Health District. Though the district court did not clearly state this, it seems that it analogized the submission of a drainage plan to a request for a variance. Evoking the language of *Palazzolo*, the court observed that, "[t]heoretically, Plaintiffs could submit plans *ad infinitum* only to be told that each plan was unacceptable, but that Defendant Health District was willing to consider yet another plan." As noted above, a single rejected variance request is enough to satisfy *Williamson County* finality. *Seguin*, 968 F.2d at 587. Thus, the court did not err in concluding that the rejected drainage plan is also enough to satisfy the first prong of *Williamson County*.

*2. State Proceedings*

Both parties agree that the applicable state procedure for seeking just compensation is a writ of mandamus seeking an order compelling the government to initiate an appropriation action, as authorized by Chapter 163 of the Ohio Revised Code. *See Levin v. City of Sheffield Lake*, 637 N.E. 2d 319, 322-23 (Ohio 1994). At the time the district court was considering Appellants' federal takings claim, Appellants had initiated such action, but the state court had not yet issued a decision. In order to avoid dismissal of their federal claims, Appellants argued that the state proceedings were irrelevant because under the inadequacy exception of *Williamson County* they were not actually

required to pursue those remedies. The district court was unconvinced by the inadequacy argument and held that Appellants' federal claims were unripe because the state court had not issued a decision denying them compensation. Subsequently, the state court dismissed Appellants' complaint for mandamus. The Appellants brought this argument to the attention of the district court by filing a supplement to their previous Rule 60(b) motion for relief from judgment. In denying the Appellants' Rule 60(b) motion, the district court did not mention the state court decision.

On appeal before this court, Appellants assert two parallel lines of argument. First, they argue that the district court erred in holding that the state proceedings were adequate. Second, Appellants argue that the district court erred in denying their Rule 60(b) motion. There is no evidence in the record that Appellants appealed the denial of their Rule 60(b) motion; thus, Appellants' second argument is not properly before this court. *See, e.g.*, *Green v. Union Foundry Co.*, 281 F.3d 1229, 1233 (11th Cir. 2002) (declining to consider the district court's ruling on post-judgment motion that was not properly appealed). Nor are we convinced by the Appellants' argument that the state proceedings were irrelevant because they were exempt from pursuing them under the inadequacy exception of *Williamson County*.

In general, the second prong of *Williamson County* requires that property owners first seek and be denied compensation in state court proceedings. This requirement is waived if the property owner can show that the state court proceedings are inadequate. *Williamson County*, 473 U.S. at 195. Appellants argue that Ohio's proceedings are inadequate because Appellants "cannot recover all of their damages in an appropriation action under state law," but they would be able to "collect

. . . damages in federal court that are not allowed in state court." (Appellants' Br. 38, 41). This argument is specious.

Appellants estimate the value of their allegedly taken property to be $345,000. In addition to this, they also seek consequential damages "due to delay" in the amount of $280,000. (Appellants' Br. 39-40). They also demand $50,000, which is the interest on incurred construction loans, utilities, insurance, and real estate taxes during the period of time after the permits were revoked. Appellants argue that under Ohio law they can recover only the value of the property and not any consequential damages. Assuming that Appellants are correct in asserting that Ohio law prevents them from collecting these kind of consequential damages in an appropriation proceeding, this fact is irrelevant because Appellants are also barred from collecting those damages in federal court. The Supreme Court has consistently held that consequential damages are not available in § 1983 takings cases. *See, e.g.*, *United States v. General Motors Corp.*, 323 U.S. 373, 379-80 (1945) ("We are not to be taken as departing from the [case law] laid down, which we think sound. . . . [D]amage to . . . rights of ownership does not include losses to [one's] business or other consequential damage."); *United States v. 50 Acres of Land*, 469 U.S. 24, 33 (1984) ("This view is consistent . . . with our prior holdings that the Fifth Amendment does not require any award for consequential damages arising from a condemnation.").

Just as condemnation practice "provide[s] little guidance" to the question of whether § 1983 Appellants are entitled to a jury, § 1983 remedies provide little guidance to determining whether condemnation proceedings are adequate. The only inquiry we should make is whether Ohio's proceedings can adequately provide just compensation for takings. This circuit has previously held

that Ohio's *scheme* is adequate. In *Coles v. Granville*, we recognized that "Ohio has reasonable, certain, and adequate procedures for plaintiffs to pursue compensation for an involuntary taking." 448 F.3d 853, 865 (6th Cir. 2006) (internal quotation marks omitted). Appellants provide no cogent argument as to why we should revisit this holding. The district court held that though the Health District had issued a final decision in regard to their property, Appellants had not sought and been denied compensation for the alleged regulatory taking. The district court did not err in these determinations, and thus did not err in dismissing Appellants' § 1983 claims for an uncompensated taking as unripe under *Williamson County*.

The district court's determination was correct at the time of its decision, but circumstances have since changed with the state court rulings. Although the Ohio Court of Appeals based its decision on Appellants' failure to exhaust administrative remedies and was not a decision on the merits, its resolution of the mandamus petition provides the requisite denial of compensation through state procedures. *See DLX, Inc.*, 381 F.3d at 518-19 (holding that administrative exhaustion is not required to establish prong-two ripeness under *Williamson* in a § 1983 takings case). Appellants' claim is now ripe. We therefore vacate the grant of summary judgment to the Health District and remand for further proceedings.

**C. Due Process Claims**

Finally, we address the Appelants' due process claims. Appellants' procedural due process claim is uncontroversially ancillary to their takings claim. As such, it is subject to the requirements of *Williamson County* ripeness. *Arnett*, 281 F.3d at 562-63 ("Procedural due process and equal protection claims that are ancillary to taking claims are subject to the same *Williamson* ripeness

requirements . . . .").  Because the takings claims have since ripened, Appellants' procedural due process claims have also ripened.  *See DLX, Inc.*, 381 F.3d at 518-19.  We accordingly vacate the district court's decision on this point and remand for further proceedings.

As for Appellants' substantive due process claims, they argue that there was "no rational basis for Defendants' conduct in revoking [Appellants'] permits" and that these actions were "arbitrary and capricious" to the degree that they constituted a violation of substantive due process. (Appellants' Br. 49).  Appellants provide a mere paragraph of argument and rely on a single case, *Warren v. City of Athens*, 411 F.3d 697 (6th Cir. 2005), in support of their position.

*Warren*, however, is not particularly helpful because the court in that case held that "given the law, the facts, and the [appellants'] own arguments and characterization of their claims, we cannot conclude that the City violated the [appellants'] substantive due process rights." *Id.* at 708. This court must conclude the same.

> Where a substantive due process attack is made on state *administrative* action, the scope of review by the federal courts is extremely narrow.  To prevail, a plaintiff must show that the state administrative agency has been guilty of "arbitrary and capricious action" in the *strict* sense, meaning "that there is no rational basis for the . . . [administrative] decision."

*Pearson v. Grand Blanc*, 961 F.2d 1211, 1221 (6th Cir. 1992) (omission and alteration in original) (quoting *Stevens v. Hunt*, 646 F.2d 1168, 1170 (6th Cir. 1981)).  This is a highly deferential standard, and one that Appellants have not met.

Appellants argue that "there is no evidence in the record that there was ever any ponding . . . where the septic tanks and leach beds could have been installed."  (Appellants' Br. 50).  This is a gross  mischaracterization of the record, which includes nearly a thousand pages of deposition

testimony and affidavits[8] that clearly demonstrate that the Health District's decision was quite rationally related to its legitimate concerns with public health and safety. Accordingly, we affirm the district court's decision as to its determination that Appellants suffered no violation of their rights to substantive due process.

III

Though we vacate the district court's decision in part, we note that the Appellants have made this case unnecessarily complex. They instigated federal proceedings before attempting to go through the required state court channel. Then, instead of staying the federal action, they stubbornly pushed forward only to have their federal claims dismissed as being unripe. Appellants then moved for relief from the federal court judgment, but did not give the district court a chance to rule on that motion before appealing to our court. Shortly thereafter, the Ohio state court dismissed Appellants' claims as unripe on the grounds that they had failed to pursue the required administrative proceedings. Appellants turned back to the district court, even though they had already appealed the case to this court, and asked the district court to take notice of the state court decision. The district court subsequently denied Appellants' Rule 60(b) motion. Instead of appealing the denial of the motion, Appellants continued with their appeal of the district court's underlying decision, improperly tacking on their arguments in regard to the district court's deposition of their 60(b) motion. Regardless of

---

[8] *See, e.g.*, the deposition of Health District's expert witness, Thomas A. McCrate, and the accompanying photographs demonstrating flooding in areas adjacent to Lots 4 and 5. McCrate explains how information regarding lots 4 and 5 can be extrapolated by comparing the water level displayed in the photographs with topographical maps.

No. 06-3869
Crosby v. Pickaway County Gen. Health Dist.

whether Appellants' takings claims are now ripe, the district court was correct, at the time, to decide that those claims unripe.   We remand because those claims have since ripened; nevertheless, we do not condone the Appellants' apparent strategy of  bouncing their claims off  both state and federal courts.